IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>BRIAN EUGENE SCHENCK,<br><br>　　　　　　　　Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 1:15-cr-73<br><br><br>Judge Dee Benson |

　　　　This matter came before the Court on Defendant's Motion to Suppress. An evidentiary hearing was held April 6-7, 2017 on that motion. Defendant alleged a variety of violations relating to his arrests on June 10, 2015, August 25, 2015, and September 14, 2015. The Court took testimony as it related to the first two arrests. At the hearing Defendant conceded there were no constitutional violations related to the September arrest. Having considered the evidence and the applicable law, the Court enters the following Memorandum Decision and Order denying Defendant's Motion to Suppress.

## FINDINGS OF FACT

### Clearfield Days Inn (June 9-10, 2015)

1. In the late hours of June 9, 2017, Weber Morgan Narcotics Strike Force Agent Denton Harper received a tip from a confidential informant that Brian Schenck was staying at the Clearfield Days Inn. Defendant was already under investigation for drug distribution based upon a prior narcotics arrest of Chase Swertferger, and his admission that Defendant was his supplier of narcotics.

2. When Strike Force Agents went to the Clearfield Days Inn they observed Chase Swertferger walking in the parking lot. Agents contacted Swertferger and inquired as to

his activity at the hotel. During this conversation Swertferger confirmed a motorcycle observed in the parking lot belonged to Defendant.

3. While some agents spoke with Swertferger, other agents contacted the Days Inn front desk employee, who confirmed Swertferger had rented rooms #224 and #209.

4. The agents then simultaneously approached rooms #224 and #209. The occupants of #224 answered the door, explained their travel plans, and permitted agents to search their room. No other individuals or contraband were located inside the room.

5. When agents knocked on room #209's door, they heard movement inside and the toilet flushing repeatedly. However, despite loudly knocking and identifying themselves, no one would answer the door. Agents then determined to pursue a search warrant.

6. Agents sought the assistance of a police K-9 in conjunction with obtaining a warrant. Former Davis County Deputy Jeremy Varella responded to the scene.

7. On that day, Mr. Varella was certified as a K-9 handler, K-9 instructor, and a K-9 judge.

8. Mr. Varella's K-9, Achilles, was also a properly trained and certified narcotics K-9.

9. Once Mr. Varella arrived, agents requested he run his dog on the second floor of the Days Inn. At no point prior to deploying his K-9 was Mr. Varella told which room agents were investigating.

10. Mr. Varella deployed Achilles by releasing him from his leash and giving him the signal to search for narcotics. K-9 Achilles started down the hall and alerted by snapping his head toward room #209 as he walked past the room. Achilles moved towards room #209 and began sniffing the seam where the door meets the floor. After smelling this area K-9 Achilles gave a positive indication for narcotics by staring. Mr. Varella then reported the positive indication to the agents.

11. While Mr. Varella was assisting the investigation inside the Days Inn, agents went outside to ensure no one escaped from the back of room #209. When agents came to the back of the hotel they observed an open window of what appeared to be room #209, the screen lying on the ground directly below it, and a coat hanging from a nearby tree.

12. Fearing that someone had jumped from the window, agents began searching the immediate area. While doing so agents found directly behind the open window a black bag containing a large quantity of methamphetamine, heroin, marijuana, and US currency. Agents also found a .40 caliber handgun in close proximity to the black bag.

13. Agents removed the coat from the tree and located $24,750 in one pocket and $4,890 in the other.

14. In the early morning hours of June 10, 2017, a knock and announce search warrant for room #209 and Defendant was approved by Utah State District Court Judge John R. Morris.

15. Agents knocked on room #209 and announced the search warrant. After a few moments Defendant answered the door. During the course of the search police found $3,019 in currency on Defendant's person and another $1,977 in the hotel room.

**Ogden Days Inn (August 25, 2015)**

16. On August 11, 2015, the Riverdale Police Department received a stolen vehicle complaint. The complainant, Ty Bradley, told a Riverdale Police Officer that Kenneth Peterson sold his truck, a 1998 Chevrolet, without permission approximately two weeks prior.

17. Riverdale Police Detective Joel Pippin investigated this case. Detective Pippin first contacted Ty Bradley, who reported that he had heard Ken Peterson stole and later gave his truck to Defendant to pay off a debt.

18. On the evening of August 25, 2015, Detective Pippin went to 1469 Darling Street #205 in Ogden, Utah to look for Defendant, which was a known address for him. While checking the area, Detective Pippin found Bradley's truck.

19. The truck was unlocked and the inside of the truck appeared to have been stripped of anything of value. There was exposed wiring in the rear of the vehicle which was not connected to anything. Detective Pippin could also not see a key in the vehicle.

20. Detective Pippin knocked on apartment #205, but no one answered the door. He then requested assistance from the Weber-Morgan Narcotics Strike Force and Agent Denton Harper and Sergeant Brion Flinders responded.

21. Detective Pippin explained that Defendant was a suspect in the vehicle theft and asked if they had any knowledge of Defendant's current whereabouts.

22. Agent Harper knew that Defendant frequented the Days Inn on Washington Boulevard in Ogden, Utah, so he and Sgt. Flinders went to the Days Inn in search of Defendant.

23. When Agent Harper arrived at the Days Inn he observed the Defendant outside of the hotel. He then called Detective Pippin, who met them near the Ogden Days Inn. Detective Pippin and Agent Harper planned to detain Defendant for questioning once they found him.

24. Agent Harper entered the horseshoe shaped parking lot from the South, parked his vehicle, and approached where Defendant was last seen on foot. Agent Harper was wearing a ballistic vest with "POLICE" written on the front and back.

25. Detective Pippin entered the parking lot from the North. Both Detective Pippin and Agent Harper were driving unmarked police cars.

26. As Agent Harper approached Defendant's location he saw that Defendant was inside of an early 2000s Nissan passenger vehicle with a female in the passenger seat. Harper called out to Defendant by name and told him to stop because he needed to speak with him.

27. Defendant saw Agent Harper and then reversed his vehicle and fled the parking lot northbound at a high rate of speed. Detective Pippin, who was still inside of his vehicle, activated his red and blue emergency lights in an attempt to stop Defendant.

28. Defendant narrowly missed crashing into Detective Pippin's vehicle by swerving around him. Defendant then exited the parking lot northbound onto Washington Boulevard. Detective Pippin and Agent Harper both pursued Defendant in their respective vehicles. Detective Pippin caught up with the Defendant quickly because the Nissan the Defendant was driving had somehow become incapacitated and was coasting to a stop in the center turning lane.

29. Defendant stopped the vehicle facing west on Goddard Street and Detective Pippin ordered Defendant and the female passenger, Heidi Openshaw, out of the Nissan. Openshaw did not shut the passenger door when she got out. Detective Pippin took Defendant into custody for felony evading and searched his pockets where he found $13,787 in cash.

30. Inside the vehicle on the passenger floor was a Glock pistol. Agent Harper knew Defendant was a convicted felon and it was unlawful for him to possess a firearm. The

investigating officers later searched the vehicle and located a black bag with methamphetamine, heroin, and marijuana.

31. Agent Harper later interviewed Defendant at which time he confessed to evading, possessing the firearm found inside the vehicle, and possessing the narcotics.

**ANALYSIS**

Defendant asserts various constitutional violations relating to each of the two arrests. Each incident will be analyzed in turn.

**I.**

**CLEARFIELD DAYS INN (JUNE 9-10, 2015)**

In this incident Defendant firsts asserts that the search warrant failed to articulate probable cause. Defendant also challenges the reliability of the K-9, asserting that the K-9 and its handler were not properly trained, and that they failed to follow proper procedure. The Court rejects both assertions.

**A.   Sufficiency of the June 10th Warrant**

The Fourth Amendment provides that "no warrant shall issue, but upon probable cause, supported by oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In reviewing the sufficiency of a warrant the Court employs the "totality-of the-circumstances" test set forth in Illinois v. Gates, 462 U.S. 213, 238 (1983):

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of the knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Id. (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

A "fair probability" is only that, a "probability and not a prima facie showing, of criminal activity." Id. at 230. Probable cause does not require a "showing that such belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983).

The Tenth Circuit has adopted this approach to analyzing challenges to search warrants. See United States v. Artez, 389 F.3d 1106, 1111 (10th Cir. 2004) (applying the totality of the circumstances announced by the United States Supreme Court in Illinois v. Gates and admonishing that a magistrate should use "his common sense in issuing warrants."); United States v. Zarif, 192 Fed. Appx. 784, 789-790 (10th Cir. 2006)(applying the totality of the circumstances test to determine whether the magistrate had a "'substantial basis' of information to conclude probable cause existed."); United States v. Watson, 61 Fed. Appx. 514, 517 (10th Cir. 2003)("we accord great deference to the magistrate who issued the search warrant in his finding of probable cause")(quotation omitted). This "commonsense" approach to determining the existence of probable cause is required over a hyper-technical reading because affidavits for search warrants are "normally drafted by nonlawyers in the midst and haste of a criminal investigation" and therefore the "'[t]echnical requirements of elaborate specificity . . . have no proper place in this area.'" United States v. Cardall, 773 F.2d 1128, 1131 (*citing* United States v. Ventresca, 380 U.S. 102, 108 (1965).

It is also appropriate to view the determination of probable cause with great consideration to an officer's training and experience. This is because "a trained law enforcement agent may be able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." United States v. Mendenhall, 446 U.S. 544, 563 (1980). Here, the affidavit in support of the search warrant for room #209 provided ample information for the magistrate to

7

make a common sense decision, based upon the totality of the circumstances, that there was a fair probability of contraband in room #209 and on Defendant's person.

The June 10th search warrant details the investigative history involving Swertferger and his involvement in narcotics, specifically noting that Swertferger admitted that Defendant was his drug supplier. On June 9, 2015, a confidential informant told agents that Defendant was at the Days Inn, which appeared to be a credible tip when Swertfeger, a known criminal associate, was seen outside the hotel. Swertferger then admitted to agents Defendant's motorcycle was in the hotel's parking lot, and agents confirmed that Swertferger had rented two rooms at the Days Inn.

Agents followed up on this information by attempting contact with the occupants in rooms #224 and #209. It quickly became apparent that the occupants of room #224 had no connection to Defendant--they promptly answered their door, they identified themselves and their travel plans, and consented to a search of their room, which revealed no additional people or contraband.

Room #209, on the other hand, yielded a very different result. No one would answer the door, even though agents were both loudly knocking and loudly identifying themselves as police. Instead, the agents heard people moving around the hotel room and the toilet repeatedly flushing. The alert and positive indication from K-9 Achilles on room #209 supported their concern that there were likely narcotics in the room.

Based on the foregoing agents began to procure a search warrant for room #209. While attempting to secure the area agents went to the back side of the hotel and located a window screen had been removed and was lying directly below room #209. Hanging in a tree near the open window agents found a coat containing thousands of dollars. In a nearby backyard adjacent to room #209's window agents also found a bag containing a large quantity of

methamphetamine, heroin, and marijuana. A handgun was also found in close proximity to that bag. The evidence found outside the room #209's window further strengthens the inference of drug distribution and sales.

All of these facts, taken in their totality, support a finding of probable cause. There was a fair probability that the Defendant was present in room #209 based upon the informant's tip indicating he was there, Defendant's motorcycle found in the hotel's parking lot, a known associate also at the hotel, and that he was not present in the one of two rooms rented by an associate.

Similarly, the repeated flushing of toilets of room #209, coupled with a distributable quantity of drugs, a large amount of cash, and a handgun found in proximity to room #209's open window, creates probable cause to search the room. The positive indication of the K-9 on room #209 only further solidifies probable cause.

**B. Mr. Varella and K-9 Achilles' Training and Reliability**

Defendant next challenges the reliability of K-9 Achilles' alert and positive indication on room #209. The Tenth Circuit has repeatedly held that probable cause to search can be based on alerts and indications by trained dogs. See United States v. Bradford, 423 F.3d 1149, 1160 (10th Cir.2005). These narcotics dogs, however, must be "reliable" or "trained" in order for an alert to support probable cause. United States v. Clarkson, 551 F.3d 1196, 1203 (10th Cir.2009). Completion of a training course and a current certification satisfies the "trained" and "reliable" requirement. Id. Tenth Circuit law also places the burden on the party seeking to suppress evidence to prove the dog is unqualified. Id. at 1204. Here, Mr. Varella testified that he had completed extensive training with K-9 Achilles and that they trained on a weekly basis. Through this training, both Mr. Varella and Achilles were certified through Utah's Police Officer's

9

Standards and Training in narcotics detection, and were so certified on June 10, 2015. Defendant failed to marshal any evidence contradicting their reliability and certification. Accordingly, the Court finds that Mr. Varella and K-9 Achilles were properly trained and reliable.

Defendant further asserts that Mr. Varella failed to follow proper policies and procedures, thus negating any probable cause created by the Achilles' alert and indication. Again, Defendant fails to marshal any evidence to support this claim. To the contrary, the evidence presented overwhelmingly demonstrated confidence in Mr. Varella and K-9 Achilles. Mr. Varella testified that not only is he a certified K-9 handler, but his training and experience is so extensive that he is a K-9 Judge, certifying that other dogs and their handlers follow proper policy and procedure and meet the requisite standards for certification. Indeed, Mr. Varella has exceptional knowledge, training, and experience training dogs in narcotics identification. Mr. Varella used this knowledge and experience to personally train and later certify with Achilles. Mr. Valrella testified that after certifying with Achilles, he continued weekly training with Achilles to keep the dog's skills sharp. Given this testimony, and Defendant's failure to present any evidence demonstrating a deviation or failure to follow any particular policy or procedure, the Court also rejects this claim.

Given that Mr. Varella followed proper policy and procedure, coupled with the certifications and finding of reliability, the Court finds that Achilles' alert and indication on room #209 provided probable cause to search the room. A narcotics dog may give a general "alert" when its physical reaction symbolizes the general presence of an odor it is trained to detect. United States v. Parada, 577 F.3d 1275, 1281 (10th Cir.2009). This is usually followed by an indication, where, at the end of a search, "the dog through its physical characteristics and natural abilities pinpoints that exact location of where the odor is coming from." United States v.

Forbes, 528 F.3d 1273, 1276 (10th Cir.2008). While a final indication is preferable, Tenth Circuit law holds that an alert is sufficient to establish probable cause for a search. Parada, 577 F.3d at 1282.

In this case, Mr. Varella observed Achilles make two separate changes in behavior after being deployed. Achilles first alerted on room #209 by snapping his head toward the door as he walked by it. Achilles then sniffed the seam of the door and gave a final indication by staring. This alert and final indication provided probable cause to search room #209. Because the search warrant detailed the positive indication from a reliable K-9, the warrant contained probable cause, and was thus a valid warrant.

**C. Good-Faith Reliance on a Facially Valid Search Warrant**

Even if the warrant failed to contain probable cause, the agent's relied on the warrant in good-faith. If a search warrant is later found to lack probable cause, evidence seized pursuant to the warrant "does not necessarily have to be suppressed." United States v. Riccardi, 405 F.3d 852, 863 (10th Cir.2005). "Ordinarily, courts will remedy a Fourth Amendment violation by invoking the exclusionary rule to exclude the Government's introduction of the unlawfully seized evidence as direct evidence against the defendant in a criminal prosecution." United States v. Herrera, 444 F.3d. 1238, 1248 (10th Cir.2006). But in United States v. Leon, 468 U.S. 897 (1984), the Supreme Court established that "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herrying v. United States, 555 U.S. 135, 142 (2009)(quoting Leon, 468 U.S. at 922). Leon's holding is known as the "good-faith exception" to the exclusionary rule.

When courts consider whether the officer relied in good faith upon a warrant, it must look to the underlying documents to see whether they are *devoid* of factual support, not merely whether the facts they contain are legally sufficient." United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir.1985); see United States v. Roach, 582 F.3d 1192, 1204 (10th Cir.2009); United States v. Gonzales, 399 F.3d 1225, 1230 (10th Cir.2005). A "'bare bones' affidavit" may be so lacking in probable cause that an officer could not reasonably rely upon it. Corral–Corral, 899 F.2d at 934 (quoting Leon, 468 U.S. at 926, 104 S.Ct. 3405). But the affidavit does not have to be a "model of specificity." See id. "An affidavit has enough factual support to justify reliance if it establishes a *minimally sufficient nexus* between the illegal activity and the place to be searched." United States v. Henderson, 595 F.3d 1198, 1202 (10th Cir.2010) (emphasis added) (quotations omitted).

Here, Agent Harper detailed specific evidence which he believed established probable cause to support the warrant. The level of detail in the warrant was far from "bare bones," rather it provided an abundance of factual support to justify a reasonable reliance on the sufficiency of the warrant.[1]

## II.

## **OGDEN DAYS INN (August 25, 2015)**

Stemming from this arrest Defendant first asserts that police lacked reasonable suspicion and probable cause to conduct a traffic stop. Defendant also contends that even if the traffic stop was lawful, both he and his vehicle were unlawfully searched without a warrant. The Court finds

---

[1] In his initial motion to suppress, defendant alleged that the warrant was signed by the magistrate judge without sufficient review based on the e-warrant time and date stamp. However, defendant did nothing to develop or support this argument at the evidentiary hearing and did not brief the issue post-hearing. Accordingly, the Court concludes that the defendant has both abandoned and waived this argument.

police had probable cause to conduct a traffic stop and the subsequent searches of his person and vehicle were done pursuant to a lawful exception to the warrant requirement.

**A. The Traffic Stop**

Defendant asserts that police lacked probable cause or reasonable articulable suspicion to initiate a traffic stop at the Days Inn on August 25, 2015. The United States Supreme Court has stated that "as long as an officer suspects that the 'driver is violating any one of the multitude of applicable traffic and equipment regulations,' the police officer may legally stop the vehicle." Delaware v. Prouse, 440 U.S. 648, 661 (1979) (internal citations omitted). A stop "is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime or traffic violation." United States v. McHugh, 639 F.3d 1250, 1255 (10th Cir. 2011).

In this case, Detective Pippin was conducting an investigation into a stolen vehicle where Defendant was identified as a main suspect. Detective Pippin found the stolen truck at an address associated with Defendant. The truck had been stripped clean of anything of value and was unlocked. He asked Agent Harper to locate Defendant if he could. Agent Harper began driving around Ogden and specifically drove around the Days Inn parking lot in Ogden. While there Agent Harper noticed the Defendant standing near the corner of the building, so he contacted Detective Pippen to let him know he had located Defendant.

Upon Detective Pippin's arrival they observed Defendant driving a vehicle in the parking lot. Agent Harper, wearing a ballistic vest with "POLICE" in lettering across it, exited his vehicle and told Defendant to stop his vehicle. As Defendant saw and heard this, he put his car into reverse and attempted to elude the officers by driving at a high rate of speed toward one of the parking lot's exits. Detective Pippin positioned his police vehicle so as to block this exit and

so his red and blue emergency lights were flashing toward Defendant's approaching vehicle. Defendant, however, dangerously maneuvered around Detective Pippen's vehicle and drove out onto Washington Boulevard at a high rate of speed. A short distance later, Defendant' vehicle became inoperable, rolled to a stop, and he was taken into custody for felony evading.

The Court concludes that Defendant's flight from police, after having received both audible and visual commands to stop his vehicle, created probable cause to stop and arrest him for the offense of Failure to Stop at Command of Peace Officer. See UTAH CODE ANN. 41-6A-210 (2015).

**B. Warrantless Searches**

Upon apprehending Defendant for this offense, he was lawfully searched incident to arrest. See Illinois v. Lafayette, 462 U.S. 640, 644 (1983) ("[I]mmediately upon arrest an officer may search the person of the arrestee; he may also search the area within the arrestee's immediate control."). During that search Detective Pippin found $13,787 in cash. Officers then examined the vehicle from outside the passenger door where the Glock pistol was visible in plain view. Because of his previous and ongoing investigation into Defendant's criminal conduct, Agent Harper knew Defendant was a convicted felon and could not legally possess the firearm. The officers then searched the vehicle for evidence of additional illegal weapons where they located a black bag with methamphetamine, heroin, marijuana, and drug paraphernalia. See United States v. Sparks, 291 F.3d 683 (10th Cir. 2002) (holding that 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without a warrant.'"); United States v. Chavez, 534 F.3d 1338, 1344 (10th Cir. 2008) (holding "probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.").

14

Upon discovering the firearm in plain view on the floorboard of the vehicle, the police officers had probable cause to search Defendant's vehicle for additional evidence of Defendant possessing weapons. The officers then legally searched the black bag and located the illegal narcotics and paraphernalia. Because police had probable cause to search Defendant and his vehicle, and the searches were done pursuant to a lawful exception to the search warrant requirement, the evidence obtained from those searches was lawfully obtained, and thus admissible at trial.

## **CONCLUSION**

For the reasons stated above, the Court denies Defendant's Motion to Suppress.

**DATED** this 3rd day of July, 2017.

_____
Dee V. Benson
United States District Court Judge